**UNITED STATES of America ex rel. Martin SOSTRE, Petitioner,**

v.

**Frank M. FESTA, Superintendent of Erie County Jail, and Robert J. Henderson, Superintendent of Auburn Correctional Facility, Respondents.**

**Civ. No. 1972–237.**

United States District Court.
W. D. New York.

March 15, 1974.

---

83. Exhibit P–35.

84. N.T. p. 2–36.

New York Civil Liberties Union (Paul G. Chevigny, New York City, Herman Schwartz and Edward I. Koren, Buffalo, N.Y. of counsel), National Conference of Black Lawyers (W. Haywood Burns, New York City, of counsel), Lynn, J. Walker, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. of N. Y. (Douglas S. Cream, Asst. Atty. Gen., Buffalo, N.Y., of counsel), for respondent Robert J. Henderson.

CURTIN, District Judge.

This is an application for a writ of habeas corpus by state prisoner Martin Sostre, who was convicted on March 18, 1968 of possession of a dangerous drug, sale of a dangerous drug, and second degree assault in Erie County Court before County Court Judge Frederick M. Marshall. He was sentenced for the sale of the drug to an indeterminate term of not less than twenty-five (25) years or more than thirty (30) years, for assault in the second degree to a term of not less than five (5) or more than ten (10) years, for possession of the drug to a term of one (1) year, and for contempt of court committed on March 18, 1968 to a term of thirty (30) days. The court ordered the sentences to run consecutively.

The application to this court, which seeks only to set aside the conviction for the sale of the dangerous drug, is based on the recantation of the testimony of the principal prosecution witness at Sostre's trial. That witness was Arto Williams, a heroin addict, awaiting trial in the Erie County Jail on a larceny charge. During Sostre's trial, Williams, who became an informant for the Buffalo Police Department Narcotics Squad, testified that he purchased heroin from the petitioner on July 14, 1967. In April of 1971, Williams executed an affidavit recanting that testimony. In his affidavit Williams swears that he lied at Sostre's trial, that Sostre never sold him any drugs, and that Williams framed Sostre to avoid his own conviction as a second felony offender. The affidavit further states that Williams was recanting his testimony after realizing "the importance of telling the truth and . . . after discussion with . . . [a] coordinator of Tuum Est." Based upon the Williams affidavit, petitioner applied for a writ of error coram nobis in the Erie County Court. Because Williams resided in California and refused to voluntarily come to New York State, and because the state court was without the power to obtain his attendance by subpoena or order, Sostre was unable to secure the attendance of Williams at a hearing on his coram nobis application. Thus, based on Sostre's inability to produce Williams, the application for a writ of error coram nobis was denied on March 30, 1972. On that same day, petitioner filed this application for a writ of habeas corpus. Petitioner has not appealed the dismissal of the state coram nobis application, but counsel have stipulated that the absence of any provision under state law to secure the attendance of Williams as a witness in the state court proceeding would make any such appeal futile. Although at the time this action was commenced petitioner's direct appeal from his conviction was still pending in the New York State courts, counsel for both parties have agreed that the issues here are presented outside the trial record and are thus not reviewable on direct appeal of petitioner's conviction.[1]

1. On October 31, 1973 the Supreme Court, Appellate Division, Fourth Department, affirmed petitioner's conviction without opinion, but modified the judgment to provide that the sentences run concurrently. On January 16, 1974 petitioner's application for leave to appeal from that Appellate Division decision to the Court of Appeals of New York State was denied.

The court finds that petitioner is entitled to proceed under Title 28, United States Code, Section 2254(b), which provides in part that

[a]n application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears . . . that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

The proceedings in this court were delayed for some time because petitioner's counsel had difficulty locating Arto Williams, who was in California. In May of 1973, Williams was located in custody in California and an application was made by petitioner for a writ of habeas corpus ad testificandum. The writ was granted and, through the cooperation of the United States Attorney and the United States Marshal, Williams was transported from California to Buffalo, New York. After also ordering Sostre's appearance, a hearing was held in this court on May 29 and May 30, 1973. At the hearing the court heard testimony from Arto Williams, Martin Sostre and various police officers who participated in the investigation and arrest. The court received a transcript of petitioner's Erie County Court trial and various exhibits. These exhibits consisted of photographs of the Martin Sostre bookstore where the alleged sale occurred, and a copy of the affidavit of State Trooper Lewis Steverson upon which the application for a search warrant was based. By stipulation of counsel, the court considered exhibits A through J which are annexed to a notice of motion dated July 18, 1973. These exhibits set forth the details of Arto Williams' criminal record after he left the Buffalo area for Califarnia. The court sustained petitioner's objection to, and has not considered, exhibit K, a letter written by a Buffalo attorney.

## THE TRIAL

The transcript of the Erie County Court trial of March 1968 reveals that Sostre, appearing as his own attorney, rejected the offer of the County Court Judge for assigned counsel. The court requested counsel and an investigator to be available to Sostre during the course of the trial. At the direction of the court, they attempted to track down certain leads suggested by the defendant. Judge Marshall ordered the reporter to prepare daily copy for the use of petitioner. Sostre, acting as his own counsel, refused to question the jurors during the voir dire or exercise any of his preliminary challenges; he also refused to make an opening statement, cross-examine any of the witnesses against him, or sum up to the jury. At each stage of the proceedings, Judge Marshall advised him of his rights.

At the trial, Williams testified that before the events of July 14, 1967 he had known Sostre for about a year. He related that on the evening of July 14 he met with Detective Alvin Gristmacher of the Buffalo Police Department Narcotics Squad and State Trooper Lewis T. Steverson. After being searched by Detective Gristmacher, Williams accompanied the two police officers in a police vehicle to the neighborhood of a bookstore operated by the defendant Martin Sostre, at 1412 Jefferson Avenue in the City of Buffalo. Upon arrival, he received $15.-00 from Detective Gristmacher and he and Trooper Steverson, who was in plain clothes, proceeded to the bookstore on foot. When Williams and Steverson entered the store, Sostre and Geraldine Robinson were behind the counter, not too far from the entrance.

At trial, no witness described the bookstore premises or set forth the exact positions of the parties during the transaction. Williams testified that after he and Steverson entered the store, he asked Sostre whether Sostre was "doing any business." Sostre responded that he did not want to do any business with strangers in the store. Trooper Stever-

son's testimony at the trial on this point was somewhat different. He recalled that Williams asked Sostre if he could "cop a bag." Sostre looked at Steverson and said he did not know him and that he would not do business in front of a stranger. Williams stated that he and Steverson then walked out of the store, Williams reentered and Steverson remained standing in front, a little to the left of the doorway with the door open. Williams could see Steverson and, from his vantage point, Steverson could observe Williams, Sostre and Geraldine Robinson. Steverson saw Williams give some money to Geraldine Robinson, who counted it and then said something to Sostre who was standing next to her. At trial both Steverson and Williams testified that Sostre then proceeded to the rear of the store, returned to the front and handed Williams a white glassine envelope. Upon receiving the envelope, Williams left the store and returned to Gristmacher's automobile with Steverson, where Williams handed the glassine envelope to Gristmacher. A later analysis revealed the contents of this envelope to be heroin.

While Williams and Steverson were at the bookstore with Sostre, Troopers John Wilcox and John Steinmetz testified that they were able to observe the activities in the bookstore from a surveillance position across the street. The troopers testified that they saw Williams and Steverson enter the bookstore, Steverson leave with Williams, Williams reenter, Steverson stand in front of the store and Williams again come out of the store and leave with Steverson. Further, Trooper Wilcox testified that he saw Williams hand money to the woman in the store who was standing next to Sostre. Thereafter, Wilcox observed Sostre disappear into the rear of the store and then return to the front where he handed Williams "something." Trooper Wilcox made these observations with the assistance of a telephoto lens.

After Williams delivered the envelope to Gristmacher, the officers executed a search warrant which they had previously obtained for the premises. They arrested Sostre, found a marked $10 bill in his possession, searched the bookstore and found ten glassine envelopes containing heroin in a filing cabinet in the rear of the store.

## THE HEARING

At the hearing, Arto Williams testified that after he was arrested in June 1967 on a felony charge, he contacted the Buffalo Police Department by letter, offering assistance. A short time thereafter, Detective Alvin Gristmacher of the Buffalo Police Narcotics Squad visited Williams in jail. Gristmacher asked Williams whether he knew anyone selling drugs in the Buffalo area. After Williams named a few individuals, Gristmacher asked him if he knew whether Sostre was selling drugs. Williams responded "yes." At that, Gristmacher said: "Well, we are very interested in Sostre because we believe that he was the cause of the riot at the time in '67." About a week later, Officer Gristmacher returned to the jail with Michael Amico, then Chief of the Narcotics Division in the Buffalo Police Department. Williams again stated that he knew that Sostre was selling drugs. On the next day, July 14, Williams claims he was released on his own recognizance and brought to Police Headquarters where he met Officer Gristmacher. Gristmacher gave Williams some money and arranged to meet him at about 9:00 p. m. that evening. According to Williams, he left, bought some heroin, used one-half of it and kept the rest. He also claimed that he obtained additional drugs from other individuals on the street and was still high when he met with Officer Gristmacher that evening. After meeting Gristmacher, they drove to Police Headquarters and Gristmacher went inside, leaving Williams alone in the car for about fifteen minutes. He then returned with Trooper Steverson. According to Williams, while Gristmacher was away from the car Williams se-

creted the partial bag of drugs he had purchased in the afternoon under the front seat. After driving around for a while, Gristmacher stopped at a judge's home where he obtained a search warrant. Then Gristmacher drove Steverson and Williams to the vicinity of the Sostre bookstore. Williams testified that while they were driving around, and before he got out of the car, he retrieved the half bag of drugs which he had previously placed under the right front seat. Gristmacher then gave $15.00 to Williams and he and Steverson left the car and walked to the Sostre bookstore. Williams testified that when he entered the store with Steverson, Sostre was standing behind the counter alone. After a greeting, he indicated to Sostre that he wanted to see him outside of Steverson's presence. Williams explained that this desire to see Sostre alone was communicated to Sostre by means of a motion which he could not describe at the hearing, but which he claims Sostre understood. When Sostre asked Steverson to leave, Williams and Steverson walked outside together.

During the cross-examination of Trooper Steverson by counsel for petitioner, a more detailed description of the premises and the relative position of the participants during the alleged sale was elicited. Trooper Steverson testified that when he and Williams entered, Sostre and Geraldine Robinson were standing about fifteen feet from the door of the store behind a short counter. During the transaction with Williams, they were facing the street, Robinson to the right and Sostre to the left, to one viewing from the outside. Williams was in front of them on the other side of the counter, with his back to the street. During the time of the alleged sale, Steverson stood in front of the store, about three feet from the doorway.

After walking outside with Steverson, Williams reentered the store and had a conversation with Sostre about $15.00. Several versions of this conversation were given at the hearing. Williams said that he gave $15.00 to Sostre to hold for him, without giving a reason for this request. Sostre recalled that Williams asked him to hold $15.00 so he would not "blow it." In his direct examination at the hearing, Williams stated that after he gave the $15.00 to Sostre, he brought his hand back across the counter and passed it over his shirt pocket. He said that after he gave Sostre the money, Sostre went to the rear of the store and Williams heard him talking to someone whom he assumed to be Geraldine Robinson. Then Sostre returned to the front of the store where he and Williams talked for a minute before Williams left. During cross-examination Williams said that after he gave Sostre the $15.00, Sostre went to the back room to give the money to Geraldine Robinson. When Sostre returned to the front of the store and approached the counter, Williams dropped his hand into his shirt pocket, but could not recall whether Sostre's hand touched his or not. On this point, Sostre's account of what occurred is different from Williams' version on either his direct or cross-examination. Sostre testified that after Williams requested him to hold the money so that he would not "blow it," Sostre accepted it, Williams and he made small talk and then Williams left. Sostre said that he put some of the money in the register and gave some of it to Geraldine Robinson, but he did not testify that he went to the rear of the store. He said that before Williams left he probably exchanged a slap-handshake with him but could not specifically recall. He was not cross-examined. After leaving the store, Williams and Steverson returned to the Gristmacher automobile by walking and gave Gristmacher the drugs which Williams claimed he obtained from the floor of the car, not from Sostre.

The Second Circuit, in the recent case of United States ex rel. Rice v. Vincent, 491 F.2d 1326 (2d Cir., 1974), considered the standards to be applied by the court in determining whether a witness's recantation requires a new trial. Citing Larrison v. United States, 24 F.2d 82,

87–88 (7th Cir. 1928), the court stated (emphasis original):

> [A] new trial should be granted when,
>
> (a) The court is reasonably well satisfied that the testimony given by a material witness is false.
>
> (b) That without it the jury *might* have reached a different conclusion.
>
> (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

United States ex rel. Rice v. Vincent, *supra*, 491 F.2d at 1331.

The court finds in this case that petitioner has failed to meet the first criteria of the standard adopted in *Rice*. Noting that recantations of testimony given at trial are to be "looked upon with the utmost suspicion," United States v. Troche, 213 F.2d 401, 403 (2d Cir. 1954), quoting Harrison v. United States, 7 F.2d 259, 262 (2d Cir. 1925), the court is not reasonably satisfied that the testimony given by Arto Williams at petitioner's trial was false.

There are many reasons why Williams' testimony at the hearing is unworthy of belief. Although there is no evidence before the court that Williams was threatened, the record is clear that after he testified at the 1968 Sostre trial he feared injury in Buffalo and felt safer in California. After he was released on probation in Buffalo, Williams told Peter Notaro, who prosecuted the Sostre case as Assistant District Attorney, that he wanted his probation transferred to California because he was afraid of being injured by the "friends of Martin." In September 1970 he wrote a letter to his California probation officer in which he explained that he left Buffalo because he was fearful for his life after testifying in the Sostre case. He wrote: "I guess by now you know my life is in danger." In July 1969 while Williams was on probation, he left Buffalo without permission to go to California. During 1970 he joined Tuum Est, an organization which Williams explained is devoted to influence its members to be honest with themselves and to live within the eyes of the law. He testified that it was the influence of this organization that prompted him to execute the April 1971 affidavit recanting his trial testimony. Whether Williams is sincere about this explanation is questionable because he was arrested in September 1972 and again in December 1972, in California, on heroin felony charges. In early 1973 he pled to a misdemeanor drug count. His less than candid attitude with this court was exhibited during cross-examination about these events when he insisted that he had not been arrested for a felony charge in California after the execution of the affidavit, and tried to explain away the arrest by insisting that it was for the sale of baby aspirin. His California probation was revoked in 1973 and, at the time of the hearing before this court, he was in the custody of California authorities.

Apart from the circumstances surrounding Williams' recantation, his story of the events of the evening of the Sostre arrest, on its face, is open to serious question. By his own account, when he met Sergeant Gristmacher on the evening of July 14, 1967, he was "high" from the drugs he had used during the afternoon and he had no idea of what he was expected to do. Williams' explanation that he was able to secrete the envelope, 1⅞ inches long by ⅞ of an inch wide, under the front seat of the car, and retrieve it while sitting in the rear seat without Steverson or Gristmacher being aware of it, is difficult to believe. Steverson testified that Williams was in the front seat at all times, while he was in the rear behind Williams, and that Williams never reached down for any article under the front seat.

On each occasion when Williams testified about his transaction with Sostre, he has given a different account. At the trial, Williams said he gave $15.00 to Geraldine Robinson who counted it and passed it to Sostre. This version was

confirmed at the trial and at the hearing by Trooper Steverson and the other witnesses. At the hearing, Williams testified that only Sostre was in the front of the store and he handed the $15.00 directly to him. At trial, Williams stated that after Sostre received the $15.00, Sostre went to the rear of the store, then returned to the front and handed Williams a white glassine envelope. Steverson and the others gave the same account of Sostre's movements and Steverson observed that a glassine envelope passed from Sostre to Williams. At the hearing, Williams testified that after he gave the money to Sostre, Sostre went to the rear of the store, then returned after a short interval and conversed briefly with Williams. Not even Sostre supports this testimony, for he said nothing at all about going to the rear of the store after receiving the money from Williams. Furthermore, if Williams' purpose was only to have Sostre hold the money for him, he gave no explanation of why he remained at the counter after he gave the money to Sostre.

During the hearing, Williams attempted to recant his trial testimony that Sostre passed him a glassine envelope. He gave one version of this recantation on direct and another during his cross-examination. During direct examination, Williams said that after he gave the money to Sostre, he brought his hand back across the counter and then to his shirt pocket. Upon cross-examination, he said that he waited until Sostre returned from the rear of the store before putting his hand to his pocket, and he could not recall whether he and Sostre touched hands or not. Sostre testified to a third version of the incident. He stated that he thought he exchanged a slap-handshake with Williams.

While there is much in the record to question the credibility of Arto Williams, there is no reason not to believe the testimony of the police officers who were involved. Steverson's testimony that he stood in the open doorway to Sostre's bookstore, that he had a clear and unobstructed view of the Sostre-Williams transaction, and that he saw a small glassine envelope pass from hand to hand was not shaken in any way at the hearing.[2] The testimony of the other officers relating to these events supports Steverson's testimony. There is no testimony at all that anyone made any promises whatever to Williams or made any suggestion to him other than to attempt to make an actual purchase of drugs from Sostre. Safeguards were taken to make sure that if Williams purchased drugs from Sostre, the purchase could be independently verified. He was searched, Trooper Steverson was close at hand to observe the proceedings and the other officers were across the street to verify whatever events took place in the store.

In petitioner's original application to this court for habeas corpus relief, he alleged that there was a "conspiracy" between police officers and Arto Williams to "frame" him. Counsel for petitioner has not adopted this position. The court notes that petitioner's allegation of a conspiracy is not supported in any way by the evidence. Although an attempt was made to show a close working relationship between Williams and the police officers during the Sostre investigation, petitioner failed to reveal any improper activity on the part of any of the officers to induce Williams' trial testimony. Counsel for the petitioner agree that there was no attempt made by the police to persuade Williams to testify falsely against Sostre. During the hearing, Williams was asked on cross-examination:

Q. All right. I will rephrase it for you, Mr. Williams. When was the

2. While Officer Steverson's testimony at the hearing before this court was entirely consistent with his testimony at Sostre's trial, the court notes that on cross-examination at the hearing Steverson stated that in his affidavit sworn to on July 17, 1967, he made no mention of seeing a glassine envelope. He said in that affidavit: "He [Sostre] then extended his hand to the informant and the informant extended his hand to meet Sostre's." (Hearing Tr. at 222.)

first time,—I believe you testified it was at a meeting of an organization called TUUMEST [sic].

Q. That you revealed your present story, when did that occur?

A. That's correct.

Q. That you revealed your present story, when did that occur?

A. I think it was in '71.

Q. 1971?

A. I'm nor sure, but it could be.

Q. And that was the first time that you revealed that you had lied on the stand prior to that?

A. Yes.

Q. To anybody?

A. To anybody.

Q. Police officers?

A. To anyone. (Tr. at 40.)

On further cross-examination, Williams was asked:

Q. What kind of a frame were you asked to develop with Mr. Sostre, Mr. Williams?

MR. CHEVIGNY: I object, your Honor. There is no testimony he was asked to develop a frame. (Tr. at 143.)

Although counsel for petitioner do not argue that Williams and the police officers conspired to "frame" Sostre, counsel do argue that Williams' actions made him an agent of the state. The argument continues that since the state knowingly used false testimony at trial, the writ should issue. Because the court finds that Williams' testimony at the hearing was not believable, it is not necessary to determine whether he was an agent of the state. Based on all of the facts contained in the record before the court, the writ is denied.

Certificate of probable cause and permission to appeal in forma pauperis are granted. Petitioner may file a notice of appeal with the Clerk of the United States District Court, United States Court House, Buffalo, New York, without the payment of filing fees.

So ordered.